# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ALLEN MORRIS III, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-0882 |
| | § | |
| OVERNITE TRANSPORTATION | § | |
| COMPANY, | § | |
| Defendant. | § | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Allen Morris III ("Morris") filed this lawsuit alleging that his employment with Defendant Overnite Transportation Company ("Overnite") was terminated on the basis of race discrimination and in retaliation for protected activity under Title VII of the Civil Rights Act of 1964. Plaintiff also asserts claims under Texas law for intentional infliction of emotional distress; negligence; negligent hiring, supervision, training, and retention; and violations of the Fair Labor Standards Act. The case is now before the Court on Defendant's Motion for Summary Judgment [Doc. # 25] ("Motion"), to which Plaintiff filed a Response [Doc. # 29], and Defendant has filed a Reply [Doc. # 32]. The Court has considered the parties' submissions, all matters of record, and the applicable legal authorities. Based on this review and the

presence of genuine issues of material fact, the Court concludes that Defendant's Motion should be **granted in part and denied in part.**

## I.    <u>BACKGROUND</u>

Morris, an African-American male, was employed as a truck driver with Overnite from July 28, 2000 until his termination on April 11, 2003. The parties heavily dispute the circumstances leading to Morris's termination.

Morris alleges that his supervisor, Brett Henson ("Henson"), a Caucasian, terminated him because of his race. There is evidence that in November or December 2002, Overnite employee Milton Jones ("Jones") overheard Henson tell a Caucasian dispatcher that he was "going to fire a bunch of niggers."[1] Morris also alleges that Henson asked a third-party staffing company, DRCI, if it could "send white drivers" instead of African-American drivers.[2] Morris testified that he personally heard Henson remark, regarding supervisor Cecil Sheffield, "That black 'N' better get on his Ps and Qs before I get rid of him."[3] In the months following Henson's alleged comment to the

---

[1]    Deposition of Milton Jones ("Jones Deposition"), Exhibit J to Plaintiff's Response, at 78, 81.

[2]    Memorandum dated July 7, 2004 from Elaine Weintritt, EEOC Investigator, to File 330-2003-02531, *Tony Tenney v. Overnite Transportation* ("Tenney EEOC Memorandum"), Exhibit K to Plaintiff's Response.

[3]    Deposition of Allen Morris, III ("Morris Deposition"), Exhibit D to Plaintiff's Response, at 28.

dispatcher, Henson allegedly terminated Jones and Morris, as well as Tony Tenney ("Tenney"), Larry Toliver ("Toliver"), Virgil Moore ("Moore"), and Thomas Holman ("Holman"). All are African-American.[4] Henson denies ever making racist comments at Overnite.[5]

In addition, Morris alleges that while he was employed with Overnite, Henson gave him more work and more difficult delivery assignments than he gave to Caucasian drivers. According to Morris, Henson's tone of voice and demeanor toward him and other African-American employees exhibited a lack of respect, and Caucasian employees were not treated this way.[6]

Morris also contends that his termination was in retaliation for his participation in a meeting on March 1, 2003, at which African-American and Hispanic Overnite employees voiced to Steve Smith ("Smith"), Overnite's regional vice president, their concerns regarding the alleged discriminatory manner in which Henson treated them.[7]

---

[4]  Affidavit of Tony Tenney ("Tenney Affidavit"), Exhibit E to Plaintiff's Response, ¶ 16; Affidavit of Allen Morris ("Morris Affidavit"), Exhibit F to Plaintiff's Response, ¶ 16.

[5]  Affidavit of Brett Henson ("Henson Affidavit"), Exhibit 2 to Defendant's Motion, ¶ 8.

[6]  Morris Deposition, at 126-29, 172-80.

[7]  The Court assumes for purposes of summary judgment that the meeting took place on March 1, 2003, as reflected in a statement submitted by Morris to Overnite on April 14, 2003. *See* Letter of Allen Morris dated April 14, 2003 ("Morris Appeal Letter"), Exhibit 3 to Morris Deposition. The Tenney, Morris, and Jones affidavits indicate that the meeting took place
(continued...)

The employees allegedly complained about Henson's alleged racist remarks and unfair treatment of minorities.[8] Morris claims that, at the meeting, he complained that Henson forced him to change delivery documentation to reflect that a business was closed or that the wrong address was listed when, in reality, Henson had assigned Morris too many deliveries to complete in a short span of time. Consequently, Morris contends he had not been able to make timely deliveries.[9] Morris and another meeting participant, Tenney, both allege that Henson was standing at the bottom of the stairs as the meeting's attendants exited and could easily observe the identities of those who attended. In addition, according to Tenney, Jones, and Morris, Smith's assistant took notes of the discussion in the meeting and recorded the names of the persons who spoke.[10] Henson admits he was aware of the meeting but denies ever having knowledge that racial issues were discussed.[11] Smith denies that the employees at the

---

[7]    (...continued)
       on May 1, 2003. This may be a typographical error. If the date contained in the affidavits is correct, the meeting took place *after* Plaintiff's termination. Overnite does not raise this issue.

[8]    Tenney Affidavit; Morris Affidavit; Affidavit of Milton Jones ("Jones Affidavit"), Exhibit G to Plaintiff's Response; Jones Deposition, at 74-75.

[9]    Morris Affidavit, ¶ 14.

[10]   Tenney Affidavit, ¶ 5; Morris Affidavit, ¶ 5; Jones Affidavit, ¶ 5.

[11]   Deposition of Brett Henson ("Henson Deposition"), Exhibit I to Plaintiff's Response, at 25-

meeting complained of race discrimination.[12] Morris was terminated about five weeks after the March 1 meeting.[13] Henson terminated Jones one or two weeks after the meeting.[14] In addition, meeting participants Tenney, Toliver, Moore, and Holman were subsequently terminated from employment with Overnite.[15]

Overnite asserts that it terminated Morris because of complaints from a customer and a member of the general public. On March 6, 2003, Morris was involved in an accident with J.D. Austin ("Austin"), a former Houston police officer, and his daughter. Austin sent Henson a letter complaining about Morris's behavior at the scene of the accident. The letter accused Morris of losing his temper and using obscene language.[16]

---

[11]     (...continued)
        26.

[12]     Affidavit of Steve Smith, previously filed in *Milton Jones v. Overnite Transportation Co.* ("Second Smith Affidavit"), Exhibit 4 to Defendant's Reply, ¶ 3.

[13]     Overnite Human Resources Action Form, Exhibit 4 to Morris Deposition.

[14]     Overnite Human Resources Action Form, Exhibit 2 to Henson Deposition.

[15]     Tenney Affidavit, ¶ 16; Morris Affidavit, ¶ 16.

[16]     The letter states in part:

> Please find this formal complaint against one of your drivers, Mr. Allen Morris. On Thursday, March 6, 2003 my daughter and I were going to eat lunch at approximately 12:30 p.m. While stopped in the inner lane, a large 18-wheel truck began turning in the outer lane and hit my vehicle because he turned too short. He only hit my passenger side as I pulled to the left to avoid more damage.

(continued...)

Morris denies using profanity and claims that Austin and his daughter were the ones using racial epithets, screaming, and cursing.[17]

Shortly thereafter, Overnite received another complaint about Morris's unprofessional behavior. At Henson's request, Brian Jones, a general manager with a Landry's Seafood restaurant in Kemah, Texas, sent Henson a letter describing reasons Jones was unhappy with a delivery Morris had made to the restaurant. Jones's letter states that Morris harassed the restaurant's hostess, was rude to the restaurant's manager and receiving manager, and stated that it "was not his job" to push the delivery into the receiving area.[18] Jones requested that Morris not make any deliveries

---

[16]    (...continued)
> The driver looked at us and kept on going. We started honking the horn and pointing for him to pull over, he refused. After passing a police car and he saw us continuing to honk he finally stopped and that is when the real problems started. He jumped from the truck extremely agitated and started screaming why did you hit my truck? I told him very politely that he had hit my vehicle by turning too short. My daughter at this point told Mr. Morris he had hit us – not us hit him. *He told my daughter "why don't you get the f--k back in your vehicle and shut your f-----g mouth!!!"* My daughter told him not to talk to her like that. *He again told her to "shut the f--k up, white trash!!!"* I then told my daughter to sit back down as *it appeared that Mr. Morris was going to hit her, he again was screaming and completely out of control.*

Letter dated March 10, 2003 from J.D. Austin to Brett Henson, Exhibit A to Exhibit 14 to Morris Deposition (grammar as in original; emphasis added).

[17]    Morris Deposition, at 132, 137-38, 155-56.

[18]    Brian Jones's letter states:

(continued...)

to the restaurant in the future.  Morris denies the substance of the accusations stated in the letter.[19]  It is unclear when the incident in issue occurred.

Overnite claims that Service Center Manager Donald Sluis ("Sluis") terminated Morris's employment after conducting an investigative interview with Morris

---

[18]     (...continued)
          Brett,

          As you requested, I wanted to fax you a brief summary of actions of Mr. Morris which were found to be unprofessional and/or offensive.

          1.  Harassment of our hostess.  Comments made regarding her appearance, advances and asked for phone number.

          2.     Rude to receiving manager.  Told us he only delivered to receiving department.  As we are a freestanding restaurant, we do not have a receiving department, and the areas we take deliveries from was inaccessible to the truck.  Said he couldn't deliver and we had to have a waiter unload the product for him.

          3.  As Mr. Morris stated he only delivers to a receiving area, he was asked to push product already put on a cart by our employee to the receiving area.  He stated that was not his job.

          4.  As Mr. Morris was leaving the restaurant the manager asked him to wait one moment as the manager was speaking with a guest.  Mr Morris said, "I'm out of here."  The manager then asked for his name.  Mr. Morris replied abruptly, "It's on the paper I gave your man."  Mr. Morris then exited the restaurant without further communication.

          We are extremely disappointed with the lack of service as well as the amount of negative attitude provided by Mr. Morris.  Your immediate attention to this matter would be much appreciated as we do not want Mr. Morris to deliver to our establishment in the future.

     Letter dated April 7, 2003 from Brian Jones to Brett Henson, Exhibit B to Exhibit 14 to Morris Deposition.

[19]     Morris Deposition, at 141-42, 145-53.

concerning the Landry's incident.[20]  Morris denies that he ever discussed the Landry's incident with Sluis and contends that Henson was the person who made the decision to terminate his employment.[21]

Morris filed a charge with the EEOC alleging race discrimination and retaliation for protected activity under Title VII.  The EEOC concluded that it was "unable to conclude that the information obtained establishes violations of the statutes" and issued Morris a right to sue letter.  Plaintiff timely filed this lawsuit alleging his termination was based on race discrimination and in retaliation for protected activity under Title VII and asserting additional claims under Texas law for intentional infliction of emotional distress; negligence; negligent hiring, supervision, training, and retention; and violations of the Fair Labor Standards Act.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.

---

[20]    First Affidavit of Donald Sluis ("First Sluis Affidavit"), Exhibit 3 to Defendant's Motion, ¶ 6.

[21]    Morris Deposition, at 39-40.

1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322-23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). An issue is material if its resolution could affect the outcome of the action. *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy – that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant

bears the burden of proof at trial. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Id.*[22] If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1998)). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* (quoting *Brenoettsky*, 158 F.3d at 911); *see also Quorum Health Resources, L.L.C. v. Maverick County Hosp. District*, 308 F.3d 451, 458 (5th Cir. 2002).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that unsworn pleadings do not constitute proper summary judgment evidence (quoting *Johnston v. City of Houston*, 14 F.3d

---

[22] "When a party moves for summary judgment, . . . '[i]t is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case.'" *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 440 (5th Cir. 2000) (citing *Ashe v. Corley,* 992 F.2d 540, 543 (5th Cir.1993)). "[B]efore the non-moving party is required to produce evidence in opposition to the motion, the moving party must first satisfy its obligation of demonstrating that there are no factual issues warranting trial." *Id.* (internal quotations and citations omitted). "Indeed, where a motion for summary judgment is solely based on the pleadings or only challenges the sufficiency of the plaintiff's pleadings, then such a motion should be evaluated in much the same way as a Rule 12(b)(6) motion to dismiss." *Id.* (citation omitted).

1056, 1060 (5th Cir. 1994))).  Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden.  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).  Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.*  In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts.  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## III.   TITLE VII DISCRIMINATION CLAIM

Morris claims that his termination was motivated by racial animus in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).  In its Motion, Overnite argues that Morris's Title VII discrimination claim fails because: (1) Morris cannot identify any direct evidence of discrimination; (2) Morris cannot alternatively establish a prima facie case of discrimination within the *McDonnell Douglas* framework; and (3) Overnite has articulated legitimate nondiscriminatory reasons for Morris's termination, and Morris has not presented evidence that Overnite's reasons are pretext.  Morris disputes many of Overnite's allegations and claims that genuine issues of material fact exist.  The Court concludes that summary judgment is inappropriate on Morris's discrimination claim.

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The plaintiff's burden can be met through direct evidence, statistical evidence, or by establishing a prima facie case with circumstantial evidence, as set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Urbano v. Continental Airlines*, 138 F.3d 204, 206 (5th Cir. 1998); *see also Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994). To establish a prima facie case of intentional race discrimination under the *McDonnell Douglas* framework, a plaintiff must show: (1) he is a member of a protected group; (2) he was qualified for the position he held; (3) he was discharged or suffered some other adverse employment action; and (4) he was replaced with a person outside of the protected class, or the adverse employment action was due to plaintiff's membership in the protected class. *Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir. 1997). "The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Portis*, 34 F.3d at 328 (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1984)) (footnote and other citations omitted).

Where a plaintiff presents direct evidence of race discrimination and the defendant presents evidence of a legitimate nondiscriminatory reason for its adverse

decision, the plaintiff may proceed under the "mixed-motive" analysis set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 242 (1989). *See Machinchick v. PB Power, Inc.,* 398 F.3d 345, 350 (5th Cir. 2005). This "mixed-motive analysis requires only that a plaintiff produce direct evidence that 'discriminatory animus played a role in the decision at issue,' after which, the 'burden of persuasion shifts to the defendant, who must prove that it would have taken the same action regardless of discriminatory animus.'" *Id.* (quoting *Sandstad v. CB Richard Ellis,* Inc., 309 F.3d 893, 896 (5th Cir. 2002)). Although plaintiffs presenting direct evidence may proceed under this framework, "direct evidence of discrimination is not necessary in order for a plaintiff to receive a mixed-motive analysis." *Machinchick,* 398 F.3d at 352. Where a plaintiff proceeds with circumstantial evidence on a mixed-motive theory, he must demonstrate a prima facie case of discrimination (as described above); "the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive alternative)." *Id.* If a plaintiff meets this burden, "it then falls to the

defendant to prove that the same adverse employment decision would have been made regardless of discriminatory animus." *Id.*

Overnite argues that Morris has not presented any direct evidence of discrimination and that it is therefore necessary to proceed under the *McDonnell Douglas* framework. The Fifth Circuit has defined direct evidence in the employment discrimination context as "evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption." *Portis*, 34 F.3d at 328-29; *see also Fierros v. Texas Dep't of Health*, 274 F.3d 187, 195 (5th Cir. 2001) (holding affidavit in which plaintiff stated that supervisor told her that she had been denied pay increase because she filed discrimination complaint was direct evidence of retaliatory motive because it "is evidence which, if believed, proves the fact [of intentional retaliation] without inference or presumption"). Direct evidence includes "any statement or written document showing a discriminatory motive on its face." *Portis*, 34 F.3d at 329 (citing, *inter alia*, *Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir. 1990)).

Overnite argues that Henson's alleged comments, if they occurred, are not direct evidence because they were "stray remarks" that were "unrelated to Plaintiff's termination." Defendant's Memorandum of Law ("Defendant's Memorandum") [Doc. # 26], at 9-10 (citing *Upshaw v. Dallas Heart Group,* 961 F. Supp. 997, 1000 (N.D. Tex. 1997); *Richardson v. Stadtman,* No. 3-98-CV-0151-BD(P), 1998 U.S. Dist.

LEXIS 17893, at *9-*10 (N.D. Tex. November 9, 1998)). The Court disagrees. Contrary to Overnite's assertions, Morris points to testimony about Henson's alleged discriminatory statements. This is direct evidence about Henson's bias or prejudice against African-Americans working under him. Morris alleges that Henson said he was "going to fire a bunch of niggers."[23] This statement "show[s] a discriminatory motive on its face." *See Portis*, 34 F.3d at 329. This comment is evidence that was sufficiently close in time to the termination of Plaintiff's employment and, if believed, would "prove[] the fact [of intentional discrimination] without inference or presumption."[24] *See id.* at 328-29. Morris also states that Henson asked a third-party staffing company, DRCI, if it could "send white drivers" instead of sending more African-Americans.[25] This comment is additional direct evidence that Henson sought to reduce the number of African-Americans and increase the number of Caucasians working on his staff. Overnite has not cited any case law, and the Court can locate

---

[23]    Jones Deposition, at 78, 81. Overnite argues that this statement is hearsay. The Court is unpersuaded. Jones states he personally heard Henson's comment at work in connection with matters within Henson's sphere of responsibility. The statement is thus an admission by a party opponent under Federal Rule of Evidence 801(d)(2).

[24]    This is particularly true given that, in the months after Henson made the alleged statement, at least six African-Americans were, in fact, terminated. *See* Tenney Affidavit, ¶ 16; Morris Affidavit, ¶ 16.

[25]    Tenney EEOC Memorandum. Overnite argues that this statement is inadmissible hearsay. Although the Court does not rely on this evidence for the summary judgment decision, the EEOC memorandum appears to fit within the exception to the hearsay rule for business records, Rule 803(6), or the public records, Rule 803(8).

none, holding that remarks to the effect that a person is planning to fire African-Americans and hire more Caucasians, followed within months by actual terminations of several African-Americans, is insufficient evidence to connect the comments directly to one of the specific termination decisions.

Overnite also argues that Henson's alleged statements are not direct evidence because Henson was not the decision maker on Morris's termination. Overnite contends that Sluis made the decision to terminate Morris,[26] and Morris admits that Sluis did not discriminate against him or make inappropriate racial remarks.[27] Defendant's Defendant's Memorandum, at 8-9 (citing *Jerge v. The City of Hemphill,* 80 Fed. Appx. 347, 350 n.4 (5th Cir. 2003); *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 226 (5th Cir. 2000); *Long v. Eastfield Coll.,* 88 F.3d 300, 307 (5th Cir. 1996)). The Court concludes that there is a genuine issue of fact regarding whether Henson was a decision maker with regard to Morris's termination or influenced that decision. "If the [aggrieved] employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary co-workers, it is proper to impute their discriminatory attitudes to the formal decision maker." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (citing *Russell v. McKinney*

---

[26]     First Sluis Affidavit, ¶ 4.

[27]     Morris Deposition, at 114, 170.

*Hosp. Venture,* 235 F.3d 219, 226 (5th Cir. 2000)). This is referred to as the "cat's paw analysis," under which a plaintiff "must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker "possessed leverage, or exerted influence, over the titular decision maker." *Id.* (quoting *Russell*, 235 F.3d at 227); *see also Laxton v. Gap Inc.,* 333 F.3d 572, 583 (5th Cir. 2003).

Although Sluis swears that he made the decision to terminate Morris's employment, there is probative evidence in the record to the contrary. Significantly, in response to the charge of discrimination Morris filed with the EEOC, Overnite stated that "[a]fter receiving the letter from the Landry's restaurant manager, the assistant service center manager in Houston, Brett Henson, decided to terminate the Complainant's employment for improper conduct with a customer."[28] In addition, Morris testified that Henson terminated him.[29] Sluis states that he had a conversation with Morris regarding the termination, but Morris denies discussing with Sluis the circumstances leading to or reasons for his termination.[30] Moreover, Sluis had just begun his position in Houston shortly before Morris's termination and had not even met

---

[28] Position Statement of Overnite Transportation Company filed with EEOC in response to EEOC Charge No. 330-2003-02529, Exhibit 14 to Morris Deposition.

[29] Morris Deposition, at 39-40.

[30] *Id.* at 50.

Morris until the day Morris was terminated.[31]  Further, the record reflects that Henson was actively involved in the process of terminating Morris by soliciting and receiving letters from J.D. Austin and Brian Jones to document their complaints regarding Morris, counseling Morris after the incidents, and delivering the news of the termination.  Furthermore, there is evidence that Henson had authority to terminate employees.[32]  Thus, there is a genuine issue of fact regarding who made the decision to terminate Morris and whether Henson played a pivotal role in that decision.

Because the Court concludes that there is direct evidence supporting Plaintiff's discrimination claim, the Court does not reach Defendant's other arguments regarding the merits of Plaintiff's claim under the alternative *McDonnell Douglas* approach, which applies to claims supported only by circumstantial evidence.[33]

---

[31]  *Id.* at 39-40, 42; *see also* Second Affidavit of Donald Sluis, Exhibit 2 to Defendant's Reply, ¶ 2.

[32]  Henson Deposition, at 8 (Henson admitting he was ultimately responsible for the decision to terminate Jones).

[33]  It is noted, however, that the analysis showing circumstantial evidence of mixed motive, as set forth below at 24-27 in connection with Morris's retaliation claim, appears to apply equally to this discrimination claim.

## IV.  **TITLE VII RETALIATION CLAIM**

Morris also contends that his termination was in retaliation for his participation in a meeting on March 1, 2003,[34] at which African-American and Hispanic Overnite employees allegedly voiced to Smith their concerns regarding the alleged racially discriminatory manner in which Henson treated them.[35]  In its Motion, Overnite argues that Morris cannot survive summary judgment on his retaliation claim because: (1) Morris cannot establish that Henson had knowledge that Morris engaged in protected activity; and (2) Morris cannot show that Overnite's legitimate nondiscriminatory reasons for terminating him are a pretext for retaliation.  The Court concludes that Plaintiff has established a prima facie case with circumstantial evidence under the *McDonnell Douglas* framework and that genuine issues of fact preclude summary judgment on Plaintiff's retaliation claim.

Title VII prohibits an employer from retaliating against employees who exercise their rights under the Act.  *See* 42 U.S.C. § 2000e-3(a).  As with discrimination claims, the plaintiff's burden on a retaliation claim can be met through direct evidence or by satisfying the *McDonnell Douglas* circumstantial evidence test to establish a prima facie case.  *See Urbano*, 138 F.3d at 206.  Because there is no direct evidence here that

---

[34]     *See* Morris Appeal Letter.

[35]     Morris Deposition, at 78-80; Tenney Affidavit; Morris Affidavit; Jones Affidavit.

Henson terminated Morris in retaliation for Morris's participation in protected activity, the Court applies the *McDonnell Douglas* framework for claims supported only by circumstantial evidence.

To establish a prima facie case of retaliation under this framework, the plaintiff must show that (1) he engaged in activity protected by Title VII; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Fierros,* 274 F.3d at 191; *see also Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000). "If established, a prima facie case raises an inference of discrimination, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse decision." *Patel v. Midland Memorial Hosp. & Med. Center*, 298 F.3d 333, 342 (5th Cir. 2002). "If the defendant presents such a reason, then the inference disappears." *Id.*; *see also Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 680 (5th Cir. 2001). "[T]he plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative);[36] or (2) that the defendant's reason, while true, is only one of the reasons

---

[36]     "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (continued...)

for its conduct, and another motivating factor is the plaintiff's protected characteristic. (mixed-motive[s] alternative)." *Keelan v. Majesco Software, Inc.,* 407 F.3d 332, 341 (5th Cir. 2005) (quoting *Rachid v. Jack In the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004)); *see also Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101 (2003). "The ultimate determination, in every case, is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable fact finder could infer [retaliation]." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).

There is no dispute that Morris suffered an adverse employment action. *See Fierros,* 274 F.3d at 191 (noting that discharge is an adverse employment action). Thus, Morris easily establishes this element of the prima facie case. Although Overnite, in its Reply, disputes whether Morris and others engaged in activity protected by Title VII, the second element,[37] Plaintiff has presented material evidence to the contrary. Morris states that at the March 1, 2003 meeting, Overnite employees complained about Henson's racist remarks and unfair treatment of minorities.[38] Morris

---

[36]   (...continued)
(2000). "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Russell*, 235 F.3d at 223 (citing *Reeves*, 530 U.S. at 147); *Laxton*, 333 F.3d at 578 (same).

[37]   Second Smith Affidavit, ¶ 3; Meeting notes attached to Second Smith Affidavit; *see also* First Affidavit of Steve Smith, Exhibit 4 to Defendant's Motion, ¶ 4.

[38]   *See* Tenney Affidavit; Morris Affidavit; Jones Affidavit; Jones Deposition, at 74-75.

also claims that, at the meeting, he complained that Henson forced him to change delivery documentation to reflect that a business was closed or that the wrong address was listed when, in reality, Henson had assigned Morris too many deliveries to complete in a short span of time and Morris, therefore, had not been able to timely make the deliveries.[39]

On the third prong of the prima facie test, Overnite argues that there was no causal connection between the protected activity and the adverse employment action because Henson had no knowledge that Morris engaged in protected activity. Defendant's Memorandum, at 16-17 (citing *Hamilton v. Texas Dep't of Trans.,* 206 F. Supp. 2d 826, 840 (S.D. Tex. 2001); *Sparks v. Lockheed Martin Aerospace Corp.,* No. H-97-3995, 1999 U.S. Dist. LEXIS 6278, at *32 (S.D. Tex. Apr. 13, 1999)). Overnite contends that, although Henson admits he was aware of the meeting, he did not know that issues involving race were discussed.[40] The Court concludes that Morris has adduced circumstantial evidence that Henson knew the topics discussed at the meeting. For instance, Smith traveled to Houston at the request of two African-American employees, Larry Toliver and John Polk, to discuss employee complaints about racial

---

[39]     Morris Affidavit, ¶ 14.

[40]     Henson Deposition, at 25-26.

discrimination and other issues.[41] Although counts vary in the record, attendance is estimated at about 40-50 people.[42] Morris and another meeting participant, Tenney, both allege that Henson was standing at the bottom of the stairs as the meeting's attendants exited and could easily observe the identities of those who attended.[43] In addition, according to Tenney, Jones, and Morris, Smith's assistant took notes of the discussion in the meeting and recorded the names of the persons who spoke,[44] thus allowing the reasonable inference that the assistant informed Henson in detail of the goings-on at the meeting. Morris was terminated on April 11, about six weeks after the March 1 meeting.[45] Henson terminated Jones on March 13, 2003, less than two weeks after the meeting.[46] In addition, meeting participants Tenney, Toliver, Moore, and Holman were subsequently terminated from employment with Overnite.[47]

Overnite asserts that Henson's averment that he did not know what was discussed at the March 1 meeting is "uncontroverted." The Court disagrees. Henson's

---

[41]  Tenney Affidavit, ¶ 3; Morris Affidavit, ¶ 3; Jones Affidavit, ¶ 3.

[42]  Tenney Affidavit, ¶ 4; Morris Affidavit, ¶ 4; Jones Affidavit, ¶ 4.

[43]  Tenney Affidavit, ¶ 15; Morris Affidavit, ¶ 15.

[44]  Tenney Affidavit, ¶ 5; Morris Affidavit, ¶ 5; Jones Affidavit, ¶ 5.

[45]  Overnite Human Resources Action Form, Exhibit 4 to Morris Deposition.

[46]  Overnite Human Resources Action Form, Exhibit 2 to Henson Deposition; *see also* Jones Deposition, at 74-75.

[47]  Tenney Affidavit, ¶ 16; Morris Affidavit, ¶ 16.

statement is contradicted circumstantially by the events and evidence described above. Although Plaintiff does not provide direct evidence of retaliation, his evidence of a causal connection is sufficient to make out a prima facie case.

Because Morris has established a prima facie case that raises an inference of discrimination, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse decision." *Patel*, 298 F.3d at 342. Overnite's proffered justification, two complaints by a customer and a member of the general public about Morris's behavior, meets this burden.

Thus, the burden shifts back to Morris to "offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative);[48] or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *See Keelan,* 407 F.3d at 341 (quoting *Rachid,* 376 F.3d at 312). Morris has produced evidence sufficient to satisfy his summary judgment burden on this step. He has raised

---

[48]  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000). "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Russell*, 235 F.3d at 223 (citing *Reeves*, 530 U.S. at 147); *Laxton*, 333 F.3d at 578 (same).

a genuine issue of fact regarding whether retaliation was at least one of Defendant's motivations in the termination decision.

The evidence of record narrows the issues to the mixed-motive analysis. Plaintiff has not produced meaningful evidence of falsity of Defendant's explanation that it relied on the letters of complaint. Plaintiff thus has not shown Defendant's explanation of its decision to terminate Morris to be merely a pretext. Although Morris disputes the incidents that form the basis of the complaints, he does not dispute that Overnite received the letters. Nor does Morris present evidence to contradict Overnite's position that the employer believed the complaints in the letters were true. An employer's receipt of such complaints from customers and the general public is, by itself, a legitimate reason to terminate an employee.[49]

Nevertheless, Morris has presented circumstantial evidence on the mixed-motive alternative under the *McDonnell Douglas* rubric to undercut Overnite's denial of a retaliatory motive. Plaintiff has adduced evidence sufficient to meet his summary judgment burden to raise a genuine fact issue for trial on the theory that Overnite acted with mixed motives. First, there is the reasonably close proximity of the March 1

---

[49] This is so regardless of whether the employee could disprove at trial the allegations in the complaints. In determining whether customer complaints are pretext for discrimination, "[t]he relevant inquiry is whether [the employer] reasonably believed the [customer's] complaints, not whether the complaints eventually proved to be accurate." *See Brown v. East Miss. Elec. Power Ass'n,* 989 F.2d 858, 862 (5th Cir. 1993).

meeting to Morris's April 11 termination. Furthermore, there is evidence in the record that Caucasian Overnite employees committed more repeated, arguably more significant, disciplinary violations and were not terminated. This evidence, if believed by the jury, could establish that retaliation was one of the motives that contributed to Overnite's decision to terminate Morris when it did. Specifically, Overnite's evidence shows that Paul Thorne ("Thorne"), a Caucasian employee, was written up for failure to follow work procedures on June 24, 2002, June 27, 2002, August 1, 2002, and March 5, 2003; attendance policy violations on September 20, 2001, August 13, 2002, December 5, 2002, January 14, 2003, and December 14, 2003; inefficiency on the job on December 30, 2002; leaving the premises for two hours without clocking out on September 19, 2002; and punching out early on July 16, 2001.[50] Despite issuing Thorne a "final warning" in September 2002, Overnite did not terminate Thorne for any of these numerous subsequent infractions. The record also contains evidence that Charles Preston ("Preston"), who is Caucasian, was written up for threatening or abusive language or behavior toward an account manager on December 5, 2001; failure to follow work procedures on December 12, 2001, June 8, 2002, and June 18, 2002; and improper conduct and attitude on June 30, 1999.[51] Preston was not terminated for

_____

[50]    Chart of disciplinary history, Exhibit H to Plaintiff's Response.

[51]    *Id.*

these violations, even though some of Preston's violations followed a "final warning" issued to him in December 2001. Similarly, Perry Russell ("Russell"), another Caucasian employee, was written up for failure to follow work procedures on July 16, 1998, February 8, 2002, February 14, 2002, March 28, 2002, and April 29, 2003 and attendance policy violations on June 24, 1999 and June 18, 2001.[52] Although Russell received a "final warning" in March 2002, Overnite did not terminate Russell for a subsequent violation.

In contrast, Morris was written up for failure to follow orders/instructions on January 8, 2002, failure to complete paperwork on June 11, 2002, and an attendance policy violation on August 30, 2001.[53] There is nothing in the record indicating that Overnite conferred with Morris or wrote him up for the complaint received by Overnite about the March 2003 vehicle accident or the customer complaint received in April 2003. Morris never was counseled nor received a "final warning" before his termination. Morris simply was informed that he was terminated on April 11, 2003 based on the "two occurrences of improper conduct with general public and

---

[52]     *Id.*

[53]     Overnite Corrective Action Report dated January 8, 2002, Exhibit 5 to Morris Deposition;
         Overnite Corrective Action Report dated June 11, 2002, Exhibit 6 to Morris Deposition;
         Overnite Corrective Action Report dated August 30, 2001, Exhibit 9 to Morris Deposition.

customers."[54]  Although the infractions committed by Thorne, Preston, and Russell

apparently may not have involved complaints from customers or the general public,

there are genuine issues of fact as to what the Caucasian employees' infractions

involved and whether those infractions were more or less severe than or comparable

to (in isolation or in the aggregate) the incidents leading to Morris's termination.[55]

In sum, Plaintiff Morris's circumstantial evidence is sufficient to raise a genuine

fact issue that Overnite's justification for his termination, while true, is only one of the

reasons for its conduct, and that another motivating factor was Overnite's retaliation

---

[54]     *See* Overnite Human Resources Action Form, Exhibit 4 to Morris Deposition.

[55]     Citing *Smith v. Wal-Mart Stores,* 891 F.2d 1177, 1180 (5th Cir. 1990), and various cases
outside this district, Defendant in its Reply argues that Plaintiff must show that the
misconduct for which he was discharged was "nearly identical" to that engaged in by others
who did not engage in protected activity.  The cases Defendant cites on this point involve a
"pretext" analysis in the *McDonnell-Douglas* framework, not a "mixed-motive" analysis, as
the Court undertakes here.  Thus, it is not clear that the same standard will govern on a mixed
motive claim and the Court does not definitively decide this issue at this stage.  Even if the
rule requiring "nearly identical" circumstances does apply in a mixed-motive case at the
pretext stage of the *McDonnell Douglas* analysis, there nevertheless remains a fact issue for
trial because the record does not reveal enough information to assess the comparator's
circumstances on the existing record.  Furthermore, the evidence before the Court regarding
the Caucasians with whom Morris compares himself is not the only evidence supporting a
mixed-motive theory.  The close temporal proximity of Morris's discharge to the meeting also
supports Morris's retaliation claim. *See Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188
(5th Cir. 1997) ("Close timing between an employee's protected activity and an adverse
action against him may provide the 'causal connection' required to make out a *prima facie*
case of retaliation.").  While it is also true that "once the employer offers a legitimate,
nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff
must offer some evidence from which the jury may infer that retaliation was the real motive,"
*Id.*; *accord Kolpakchi v. Principi,* 113 Fed. Appx. 633, 638 (5th Cir. 2004), the Court
concludes that Morris has done so here for summary judgment purposes.  This ruling is
without prejudice to Overnite's reurging these points at trial.

for Morris's activity protected under Title VII. *See Keelan,* 407 F.3d at 341. The evidence thus is sufficient to shift the burden back to the defendant to "prove that the same adverse employment decision would have been made regardless of [retaliatory] animus." *Id.* The evidence on this last issue is conflicting, as described above, and Defendant Overnite has not established the absence of a genuine fact issue on this matter. Overnite's true intent will have to await a trial.

## V.    REMAINING CLAIMS

Overnite also moves for summary judgment on Morris's intentional infliction of emotional distress ("IIED"); negligence; and negligent hiring, supervision, training, and retention claims. It argues that Morris's IIED claim fails because: (a) the gravamen of the complaint is racial discrimination for which Title VII provides clear remedies; and (b) Morris does not allege sufficiently outrageous conduct. It also argues that all the negligence claims fail because Morris cannot establish the existence of the required underlying tort. Plaintiff does not respond to Overnite's motion on these claims. Accordingly, these claims are deemed abandoned and are dismissed.

For the first time in its Reply, Overnite also argues that it is entitled to summary judgment on Morris's claim under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"). Overnite asserts, without citing to any law or evidence, that Plaintiff's Complaint and Response do not make any factual allegations that would constitute a

violation of the FLSA. In its Motion and Reply, Overnite does not address the merits of Plaintiff's FLSA claim, does not outline the elements of the FLSA cause of action, and does not explain what types of evidence are necessary for Plaintiff to put forth to defeat summary judgment on this claim. Thus, Overnite has not met its burden to show that it is entitled to summary judgment on this claim as a matter of law. The Court concludes that summary judgment is not appropriate on Plaintiff's FLSA claim at this time.

## VI.   <u>CONCLUSION AND ORDER</u>

Plaintiff has presented evidence which raises genuine issues of material fact in support of his discrimination and retaliation claims. Plaintiff's intentional infliction of emotional distress; negligence; and negligent hiring, training, supervision, and retention claims have been abandoned and are dismissed. Plaintiff's Fair Labor Standards Act claim also remains pending. Accordingly, it is hereby

**ORDERED** that Defendant's Motion [Doc. # 25] is **GRANTED IN PART AND DENIED IN PART**. The parties are reminded that mediation is required in this case and must be completed prior to the October 28, 2005 docket call.

SIGNED at Houston, Texas, this **20th** day of **September, 2005**.

Nancy F. Atlas
United States District Judge